ELLEN MCELLIGOTT, ADMINISTRATRIX, *vs.* EDWARD F. RANDOLPH AND ANOTHER.

New Haven & Fairfield Cos., June T., 1891. ANDREWS, C. J., CARPENTER, SEYMOUR, TORRANCE and FENN, Js.

The plaintiff's intestate lost his life by the negligence of the defendants, who were his employers. Held that the damages to be recovered were based on the injury to him, and not on the loss to his wife and children by his death.

The plaintiff's intestate was in the service of the defendants as a factory hand, and was employed by them with other workmen in removing a very heavy wheel for the purpose of having a new one put in its place, and, to avoid interruption of the ordinary work of the factory, the removal was undertaken in the night. The defendants put the work into the hands of *D*, a competent and skilled mechanic. The workmen had little mechanical skill, but were competent to do the work while under *D's* directions; otherwise not. The wheel was taken down in sections. Before the work was finished *D* went home, leaving the workmen to go on with it alone. There were ropes in a place near by that were of sufficient strength to be used, mingled with others that were not. The workmen, at a point in the work where the wheel needed to be supported by a frame and held by ropes, selected a rope that was too weak and used a wooden horse of insufficient strength, by reason of which the wheel fell over upon the intestate and killed him. Held that the defendants were liable.

And held that the intestate was not guilty of contributory negligence by reason of his remaining late at the work, when the factory superintendent had requested him to go home early, as his work would be needed the next day.

Nor because he had selected a position in his work that was more dangerous than another that he might have selected.

It is a master's duty to exercise reasonable care to provide for his servants a reasonably safe place in which to work, reasonably safe appliances and instrumentalities for his work, and fit and competent persons as his co-laborers.

Where the master employs a fit and competent agent to take charge of the work, his duty is not done until the agent acts up to the limit of the master's duty.

*D* was not to be regarded as the fellow-servant of the intestate because he was engaged in the same work with him. In the superintendence and direction of the work he represented the master.

One may in some of his acts be executing his master's duty toward the master's servants, while in others of his acts he is simply a fellow-servant. The master's responsibility or non-responsibility in case of

injury is determined, not by the rank or grade of the offending servant, but by the character of the particular act or omission to which the in jury is attributable.

[Argued June 2d—decided October 26th, 1891.]

ACTION by the plaintiff as administratrix for the loss of life of her intestate through the negligence of the defendants; brought to the Superior Court in New Haven County. The defendants suffered a default, and the case was heard in damages before *Fenn, J.* Facts found and judgment rendered for one thousand dollars damages. Both parties appealed. The case is fully stated in the opinion.

*J. O'Neill,* for the plaintiff, contended that damages should have been assessed for the loss to the wife and children of the intestate from his death, and not merely for the injury to him; that the defendants were guilty of negligence in not providing a competent overseer of the work and competent fellow-workmen to assist in it, as well as proper tools and appliances; that the leaving of the work by the overseer before it was finished was negligence in the defendants; and that the intestate had not been guilty of contributory negligence, either in the position which he selected for doing his work, or in not going home earlier, as requested by his factory superintendent.

*S. W. Kellogg,* with whom was *D. W. Webster,* for the defendants, contended that they had not been guilty of negligence, having provided a competent overseer of the work and men who when overseen by him were competent; that they were not responsible for the overseer's leaving the work before it was finished; that the overseer was a fellow-servant of the intestate; and that he was guilty of contributory negligence in the voluntary selection of a specially dangerous position in doing the work, and in not leaving the work early in the night, when requested to do so by the factory superintendent; and that the damages should therefore have been merely nominal.

McElligott *v.* Randolph.

PRENTICE, J.   The plaintiff's intestate was in the employ of the defendants, and while so employed was accidentally killed.   He left a widow, three minor children, and one child *in ventre sa mere.*   The complaint alleges that the intestate's death was caused by the defendants' negligence, and claims damages laid at $5,000.   The defendants having suffered a default, the damages were assessed by the court, and $1,000 awarded.   Both parties appeal.

The plaintiff assigns five reasons of appeal.   These reasons however are in substance one, namely, that the court failed to assess any damages based upon the pecuniary value of the life of the deceased to his wife and children.   The plaintiff's claim is that the history of legislation in this state, beginning with the act of 1848, providing for the revival of certain actions of tort, and embracing the act of 1853, fixing a maximum and minimum of recovery where death should result from railway accidents and providing for its distribution, shows that our statutes contemplate and authorize two independent cumulative recoveries—one for the pain and suffering of the deceased up to the moment of his death, and another for the subsequent loss to the surviving widow, children and heirs.   Former adjudications of this court render discussion of this claim unnecessary.   The precise question here raised was in all its aspects considered and decided in the case of *Goodsell* v. *The Hartford & New Haven Railroad Co.*, 33 Conn., 51.   The opinion of the court in that case in clear and forcible language discusses the claims urged upon us, explains the objects and relations of the acts of 1848 and 1853, and in plainest terms lays down the rule for the assessment of damages in cases of personal injuries resulting in death.   The rule thus laid down the court below applied in the case at bar.

The defendants' reasons of appeal are in substance that the facts found disclose that they were not guilty of negligence and that the plaintiff's intestate was guilty of contributory negligence.

The deceased was one of two hundred factory operatives employed by the defendants.   In the wheel-pit of the de-

fendants' factory was a large gear wheel, weighing upwards of twelve tons, which it was desired to remove for the substitution of another of an improved pattern. The work was one of some difficulty and required the exercise of mechanical skill. It was by the defendants entrusted to one Dunning, who was the master-mechanic of the factory and a capable machinist. For the performance of the work he selected from the defendants' hands ten men, the best adapted for the work. These men were not skilled or trained in mechanical work. With competent instructions, oversight and direction, however, they were competent to perform the work. Otherwise they were incompetent. Among these ten men was McElligott, who was chosen because he had requested that extra employment be given him whenever practicable, and because he had once assisted in a similar operation. In order that the removal of the wheel might interfere as little as possible with the operation of the factory, the work was performed during the night. The wheel was made up of ten sections. These sections were removed independently. About midnight, some of the sections having been removed, Dunning was induced by the entreaties of his little boy, who was present, to go home. The work grew more difficult as the removal progressed. By the removal of the fifth section, Dunning having then left, the wheel was put out of gear with the gear wheel on the engine shaft, and it became necessary to support it. Dunning had foreseen this contingency, and had given instructions for the use of a certain wooden horse for the suspension of a set of blocks and falls for the purpose of supporting and holding in place the remaining sections of the wheel when it should become out of gear. After Dunning's departure one Johnson was regarded as the foreman of the work. He, like his fellows, was without mechanical training or skill. When support of the wheel became necessary the horse was placed in position, and the block and falls attached thereto. One of the workmen went and got a rope from the defendants' stock, attached it to the shaft of the wheel, and fastened the block and falls to it. By means of this appa-

ratus the wheel was supported. It was also blocked up underneath in some way by one of the workmen. There were sufficient and suitable ropes, supports, props and other appliances, together with others which were insufficient and unsuitable, upon the premises near the point of work. Dunning gave no instructions as to which of these, save the wooden horse above referred to, should be used, or how they should be selected. Those used were picked out by one and another workman as wanted. The rope used to support the wheel was got by one Phalen, and it was by him adjusted into position. Neither the rope nor the method of its adjustment was examined by any one else. Phalen likewise put the blocking into position. This was also done without supervision or examination. This being done, the work progressed safely until during the removal of the eighth section, when the rope and horse gave way, and the wheel fell into the pit. The deceased was at the time sitting upon the hub of the wheel engaged in his work and was by the accident cast down to his death. The cause of the accident was, in the language of the finding, " the inadequacy of the support, the rope being insufficient in size and strength for the strain upon it, and the support by which the wheel was blocked being also inadequate, improperly placed to sustain the weight to which it was adapted, and the whole arrangement and device was in the highest degree unsuitable and insecure in view of the weight to be supported and the extreme hazard involved." Upon these facts the defendants claim that they had performed their whole duty in the premises in that they had provided competent and suitable persons to oversee, direct and do the work, and also suitable and sufficient appliances, tools and materials therefor.

The rule of duty of master to servant is well settled in this state. It is the master's duty to exercise reasonable care to provide for his servant a reasonably safe place in which to work, reasonably safe appliances and instrumentalities for his work, and fit and competent persons as his co-laborers. It is equally well settled that performance of these duties cannot be effected by the simple giving of an

order,—by their execution being entrusted to another. The designation of an agent, however fit and competent that agent may be, for the execution of the master's duties, does not fill out the sum of the master's obligation, nor serve to relieve the master from further responsibility. Until the agent thus selected and empowered in fact acts up to the limit of the duty of his master to act, the master's duty is not done. The master's duty requires performance. He may at his option perform in person or delegate performance to another. In either case reasonable care must be exercised in the doing of the act required to be done by the master. *Wilson* v. *Willimantic Linen Co.*, 50 Conn., 433; *Laning* v. *N. York Central R. R. Co.*, 49 N. York, 521; *Hough* v. *Texas & Pacific Railway Co.*, 100 U. S. R., 213; *Davis* v. *Central Vermont R. R. Co.*, 55 Verm., 84; *Ford* v. *Fitchburg R. R. Co.*, 110 Mass., 240; *Harper* v. *Indianapolis & St. Louis R. R. Co.*, 47 Mo., 353; *Brodeur* v. *Valley Falls Co.*, 16 R. Isl., 448; *Chicago & N. Western R. R. Co.* v. *Jackson*, 55 Ill., 492.

Wood, in his work on Master and Servant, (p. 871,) states the rule as follows:—" The rule established and supported by the better class of cases is, that whenever the master delegates to another the performance of a duty to his servants which the master has impliedly contracted to perform in person or which rests upon him as an absolute duty, he is liable for the manner in which that duty is performed by the middleman whom he has selected as his agent, and to the extent of the discharge of those duties by the middleman he stands in the place of the master."

Examining the facts of the case with reference to these legal principles, we observe that while it is true that the defendants entrusted the execution of the work upon which McElligott was engaged to a competent superintendent, provided him, McElligott, with co-laborers who were fit and competent when under competent supervision, and had upon the premises appliances and apparatus suitable for the work, it is equally true that, during the progress of much of the work, and at the time of and for a considerable time

prior to the accident, the work was wholly without compe-
tent superintendence, that there was even no one present
who was possessed of mechanical skill, that the provision of
suitable appliances was simply in the sense of there being
such near at hand mingled with others unsuitable, that
those appliances which were in fact chosen and set apart for
the work were mainly selected by unskilled factory hands,
at random and without instructions, oversight or examina-
tion, and that they were adjusted by like laborers with the
like absence of instructions, oversight and examination.

The accident happened in part because a certain wooden
horse or support was inadequate. Dunning, the superin-
tendent, selected this particular appliance and directed its
use. The wheel fell in fact because a certain rope was too
small and inadequate. The defendants had done nothing
to provide a suitable rope except to have upon the premises
a stock of various kinds of rope, some suited to one pur-
pose and some to another, and to allow any chance inexpe-
rienced laborer to select for each special use the one which
his impulse dictated. Just here we touch upon the most
significant and potent factor in the situation, namely, the
entire absence of competent superintendence during all the
later stages of the work. After Dunning's departure about
midnight there was no one, either over or connected with
the gang of men employed, who possessed any mechanical
knowledge or skill. Had Dunning remained present prop-
erly executing his master's duty entrusted to him, there
would have been no such unintelligent, hap-hazard selection
of apparatus, no such inadequate and unsuitable devices of
support, as were instrumental in McElligott's death. More-
over, Dunning's departure in an instant transformed Mc-
Elligott and his fellows from fit into unfit co-laborers. The
finding states explicitly that these men were incompetent
for the work assigned them without suitable supervision.
During the hours therefore which succeeded Dunning's re-
turn home, McElligott was surrounded only by incompetent
fellow-workmen, and he went down to his death in conse-
quence of constructions and mechanical adjustments made

by his fellow-servants, employed by the defendants to do, in company with him, what they were unfit to do. Plainly therefore the defendants' duties as masters of the deceased were not performed.

The defendants' counsel in their brief urge that, as their clients had entrusted the execution of the work to a competent agent, they were relieved from further responsibility. This position, as we have already indicated, is not well taken. They also appeal to the familiar rule that the master is not liable for injuries to one servant through the negligence of his fellow-servant, and argue, with much vigor and with an imposing array of authorities, that Dunning was a fellow-servant of the deceased and not a vice-principal of the defendants. The error in this line of reasoning lies in an attempt to classify Dunning's position by the grade or general scope of the duties of his employment. The error is one to which it must be confessed that many decisions have given countenance. But the better modern authorities have united in pointing out the error and the difficulties incident to it, and in establishing the true rule. This rule makes the character of the act or omission wherein the negligence exists, the test of the master's responsibility therefor. One may in some of his acts be executing his master's duty towards the master's servants, while in others of his acts he is simply a fellow-servant, of the same or of a higher or lower grade. The master's responsibility or non-responsibility in case of injury is determined, not by the rank or grade of the offending servant, but by the character of the particular act or omission to which the injury is attributable. 7 Am. & Eng. Encyclopedia of Law, §§ 824, 834; Wood's Master & Servant, 871, § 438; *Davis* v. *Central Vermont R. R. Co.*, 55 Verm., 84; and the other cases last cited.

There only remains to consider the defendants' claim that the facts disclose that McElligott's own negligence contributed to his death. The finding shows that as McElligott was leaving the factory upon the evening in question he was met by the factory superintendent, who, after learning that McElligott was going to work upon the removal of the

wheel, said to him—"I guess I had better see about this, because your work is such that we want you to-morrow. Do not work later than ten o'clock. I have no objection to your working until then, but after that you ought to go home and get rested for to-morrow, because we can't spare you." Dunning before his departure also said to McElligott —"Pat, you had better go home about twelve o'clock. They will need your work to-morrow." It also appears that a plank extended across the wheel pit in such manner that McElligott might have safely stood upon it in the performance of the act he was engaged in at the moment of the accident. These are the facts relied upon as showing contributory negligence.

McElligott's failure to go home clearly cannot bar recovery. Whatever the directions to him were, he in fact remained, as the finding expressly states, in the service of the defendants up to the moment of his death. His remaining did not absolve his employers from their duty to him. The relation of master and servant continued with all that that relation implies. On the other hand McElligott's remaining can in no true sense be regarded as a contributing cause of his death. It is true that if he had gone home at midnight he would not have been killed. It is equally true that if he had not gone to the work at all he would have escaped the catastrophe. His going to the work was as much the occasion of his death as his remaining at it. Neither were contributing causes in the legal sense. They were simply conditions which made his injuries possible. *Smithwick* v. *The Hall & Upson Co.*, 59 Conn., 263.

McElligott at the time of the accident was sitting upon the hub of the wheel engaged in his work. His position was a convenient one for him. It was apparently, to his observation at least, a safe one also. That, as between two apparently safe positions he failed to choose the one which proved to be safe in fact, certainly cannot be ascribed to him as negligence.

There was no error in the judgment complained of.

In this opinion the other judges concurred.